1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SOFALO MALTESE BROWN,

11              Petitioner,              No. CIV S-09-0216 FCD GGH P

12        vs.

13   WARDEN, et al.,

14              Respondents.        FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2007 conviction for evading a

19   peace officer with willful disregard for the safety of others in violation of Cal. Vehicle Code §

20   2800.2(a).  Petitioner is serving a sentence of 7 years.

21              This action is proceeding on the original petition filed January 26, 2009, which

22   raises two claims: 1) the trial court erred by permitting admission of petitioner's prior criminal

23   conduct; and 2) the prosecutor unlawfully intimidated a witness.

24              After carefully reviewing the record, the court recommends that the petition be

25   denied.

26   /////

1

1  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

2          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

3  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

4  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

5  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

6  standards of review to be used by a federal habeas court in assessing a state court's adjudication

7  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

8  (9th Cir. 1997).

9          In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

10  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

11  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

12  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

13  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

14  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

15  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

16  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

17          "Unreasonable application" of established law, on the other hand, applies to

18  mixed questions of law and fact, that is, the application of law to fact where there are no factually

19  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

20  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

21  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

22  deference is not blindly automatic, "the most important point is that an *unreasonable* application

23  of federal law is different from an incorrect application of law....[A] federal habeas court may not

24  issue the writ simply because that court concludes in its independent judgment that the relevant

25  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

26  that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

objectively unreasonable nature of the state court decision in light of controlling Supreme Court

authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated

awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

established Supreme Court authority reviewed must be a pronouncement on constitutional

principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in

dispute in any reasoned opinion, the federal court will independently review the record in

adjudication of that issue.  "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state

court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2003).

The last state court to issue a reasoned decision addressing petitioner's claims was

the California Court of Appeal.  Respondent's Lodged Documents 6, 8.  Accordingly, the court

considers whether the denial of these claims by the California Court of Appeal was an

unreasonable application of clearly established Supreme Court authority.  Shackleford v.

Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary

denial of a claim, the court "looks through" the summary disposition to the last reasoned

decision).

/////

III.  Factual Background

   The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds the summary to be accurate and adopts it below:

> "On August 28, 2003, Officers Vu and Perez of the Sacramento Police Department observed a Cadillac sitting in the center of the street on Dixieanne Boulevard. Using the spotlight on their marked patrol car, the officers could see that the front passenger did not have his seatbelt fastened. The officer followed the car as it turned onto Del Paso Boulevard and Darina Street. At that time, Officer Vu turned on the[ ] vehicles' [ sic ] lights and siren and the Cadillac failed to yield. Instead, the Cadillac began on a route which included failing to stop at two separate stop signs while going approximately [30] miles per hour. As the vehicle was going westbound on Calvados, it almost hit two bicyclists who were riding in a legal manner. After that, the Cadillac turned into an alley and the three passengers of the vehicle got out. At that same time, a white bag was thrown out the driver['s] side window. When recovered, the bag contained a handgun. Officer Perez got out of the patrol car and pursued the right front passenger. When Perez caught the passenger, later identified as Winzer Hayden, Hayden threw a white bag. In the white bag was approximately six and a half grams of rock cocaine.

> "After the driver of the Cadillac let the passengers out, the vehicle began to evade again by ... failing to stop at two stop signs while going approximately [40] and [50] miles [per hour] respectively. The Cadillac came to rest at a Popeye's restaurant [on] El Camino Avenue. The driver, defendant, is in a wheelchair and removed himself from the vehicle. While removing himself, the defendant was yelling at bystanders, '[s]ee what they are doing to me!' Under Miranda,[ FN2] defendant claimed that he was scared because he didn't know who was behind him and didn't know anything about any gun."

>   FN2. Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].

> Relying on Evidence Code section 1101, subdivision (b), the People moved to admit evidence of a prior incident during which "[d]efendant evad[ed] a peace officer with a gun and controlled substance in the vehicle." According to the People, "[o]n October 10, 2002, Sergeant Bragagnolo of the San Francisco Police Department, conducted a vehicle stop on a vehicle being driven by defendant. After Bragagnolo contacted defendant and returned momentarily to his patrol car, ... defendant took off at a high rate of speed. With his lights and siren on, Bragagnolo began to pursue the defendant. Defendant failed to stop at an intersection and then threw an item out the driver['s] side window. Defendant then failed to stop at another sign, missed an attempted turn, and jumped a curb. The defendant's vehicle finally stopped after he went through a fence and ended up in an embankment. Assisting Officer Lozada located a firearm in a white sock in the area where Sergeant Bragagnolo saw the white item being thrown. Directly below the defendant's car window, Sergeant Bragagnolo located a large quantity of a suspected controlled substance. Defendant was also in possession of more than [$6,000] in cash."

The People argued that evidence of the prior incident was relevant to refute defendant's anticipated defense, based on his statement to Officer Vu, that he did not know he was being pursued by law enforcement. More particularly, the People asserted the evidence was relevant to establish "his knowledge of the presence of law enforcement" and "his flight was not a mistake or accident." They also argued the unique circumstances of the prior and current offenses (similar patterns of reckless driving, failing to stop at stop signs, throwing firearms from a car, and presence of controlled substances) "qualif[ied] as a modus operandi as to ... defendant."

Defendant objected to the admission of evidence concerning "anything other than just an actual violation of Vehicle Code [s]ection 2800.2," and to the extent the court was inclined to allow in some evidence of the prior incident, argued such evidence should be limited to his driving and should not include "evidence that a gun or drugs were thrown out of the car back then or that [defendant] pled guilty to that." Defense counsel noted that "[a]lthough there was [a] reference in a police report to a bag being thrown out of the car" in this case, defendant had not been charged with any offense related thereto. He further asserted that any probative value of such evidence was outweighed by its prejudicial nature. As he put it, "if this jury hears that there was some prior incident of throwing a gun or drugs out of the car, [the jury is] gonna [ sic ] convict [defendant] based on that...."

The People countered that the drugs and the firearm were relevant to establish a modus operandi and lack of mistake or accident. According to the People, the drugs and the gun were "some of the key marks that ... ma[d]e this a modus operandi on these two separate occasions," and defendant's "prior ownership of a firearm" tended to defeat "the representations that had ... been made with regard to threats against him ...." The People also asserted evidence concerning the prior incident was not more prejudicial than probative because the two incidents were "almost identical."

The trial court ruled evidence concerning the prior incident, including evidence of the drugs and the firearm, was relevant and admissible to show knowledge, intent, lack of mistake or accident, motive, and a common plan or scheme. The court found defendant's "claim that he did not know law enforcement was chasing him clearly goes directly to one of the elements of the charge," namely his intent to evade, and evidence he was previously "engaged in a fairly similar law enforcement pursuit in which contraband was ultimately found and apparently thrown or ... discard[ed] ... [was] highly probative on the issue of [defendant's] knowledge, intent, [and] lack of mistake or accident in this case...." The court explained that "the observations of the officer [in the prior incident] that drugs and guns were found" provided a motive for defendant to attempt to elude the police. "And ... in this case when he disavows knowledge of a gun or any unlawful activities of passengers in his car, it does [bear] on the circumstantial inferences that can be drawn from those facts .... [¶] ... [¶] ... Otherwise the jury's left with an impression that perhaps he does not know of the unlawful conduct, and perhaps he didn't, but it does bear on that knowledge...." The court concluded the probative value of the evidence was "very high" and not substantially outweighed by any prejudice, noting the prior incident was "strikingly similar" and "no more inflammatory ... than the facts that [would] be presented [i]n the

current case." FN3

> FN3. The court ruled evidence defendant possessed the drugs for sale in the prior incident-including evidence he possessed more than $6,000 in cash-was not admissible. The court found "[t]he fact [defendant] was in possession of contraband [was] sufficient ... to establish the criteria of common scheme and plan and provide[d] probative evidence towards motive, intent and knowledge."

B

The evidence adduced at trial was substantially the same as that offered at the hearing on the motion in limine and also included the following: Officer Jacob Casella responded to the Popeye's restaurant to assist the other officers in apprehending defendant. When he arrived, defendant was still inside his car. Casella heard Vu order defendant to get out of the car and defendant respond, "I'm paralyzed." He never heard defendant say, "They had a gun on me. They forced me to drive." He did not know whether defendant said anything before he arrived. Casella canvassed the area and spoke to various individuals. None reported hearing defendant state, "They had guns. They forced me to drive." FN4

> FN4. Vu testified that he was "absolutely positive" defendant did not say "them guys had a gun, go get them" or something to that effect.

Wuatani Richard, who managed the Popeye's restaurant, was inside the restaurant when defendant and the police pulled into the parking lot and ran outside to see what was happening. When he got there, defendant was still inside his car and said something like he did not have any legs or was a paraplegic. Richard did not recall defendant screaming something like, "They had a gun on me. I had to drive."

Defendant did not testify at trial. The defense called Jamilla Stirgus and Kelton McDonald. On the night in question, Stirgus was walking to her grandmother's house when she saw defendant pull into the Popeye's parking lot while being followed by police. She heard officers order defendant to get out of his car and defendant say he could not walk. She also heard defendant say "there was some guys that had a gun to his head that is why he didn't stop, and ... 'Go get them. It's not me.' "

McDonald, who had prior convictions for possession of cocaine for sale and petty theft, was a passenger in the Cadillac on the night in question. He and two other men got into defendant's car and asked defendant to take them to the store. McDonald sat in the back seat directly behind defendant, and "Doughboy" sat in the front seat. Doughboy's name is "Winslow"; McDonald did not know the name of the third passenger. After they got in, the patrol car pulled behind the Cadillac and "hit the light on" them. Doughboy told defendant, "You better not pull over. I'm telling you, you better not pull over." FN5 Defendant responded, "No man. I have not done anything. Why don't you want me to pull over." Doughboy had something on his lap and then in his hand that he held "to the side of" defendant; McDonald did not "know if it was a pistol or knife or whatever." When defendant turned into the alley, all three passengers jumped out of the car and ran in different

directions. McDonald did not see defendant or anyone else throw anything out of the car. He said it was not possible for defendant to do so because "[he] has a hand control .... [and] has to drive with both hands." McDonald ran from police because he "was aware that someone in the car was threatening [defendant], and the only thing [he] was thinking about was some kind of kidnap [he] had nothing to do with."

> FN5. During cross-examination, McDonald said Doughboy told defendant, "If you don't want to die up in here, you better not pull over."

Defendant also sought to call Winzer Hayden as a witness at trial; however, outside the presence of the jury, Hayden invoked his Fifth Amendment right to remain silent. Additional facts concerning Hayden's invocation are set forth below in section II of the discussion.

Respondent's Lodged Document 6, pp. 2-9.

IV.  Discussion

  A.  Claim One: Evidence of Prior Incident

Petitioner alleges that the trial court erred in admitting evidence of a prior incident to prove his intent to evade the police.  The California Court of Appeal denied this claim as follows:

DISCUSSION

I

Defendant contends the trial court abused its discretion in admitting evidence of the prior evading incident because it was not sufficiently similar to the current offense and, thus, served only "to portray [him] as a person whose character or disposition was to be involved with firearms and drugs." We review the trial court's decision to admit this evidence under both Evidence Code sections 1101, subdivision (b) and 352 for abuse of discretion. ( People v. Lewis (2001) 25 Cal.4th 610, 636-637.) A discretionary decision will not be disturbed on appeal, absent " 'a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' " ( People v. Rodrigues (1994) 8 Cal.4th 1060, 1124-1125.)

As we shall explain, the trial court did not abuse its discretion in admitting evidence of the prior evading itself to establish knowledge, intent, and lack of accident or mistake, and any error in admitting evidence concerning the firearm and drugs was harmless.

Under Evidence Code section 1101, subdivision (b), "evidence that a person committed a crime" is admissible to prove a relevant fact such as knowledge,

7

intent, or lack of mistake or accident. For the purpose of deciding the admissibility of evidence under that subdivision, a plea of not guilty places all of the elements of the offense in dispute, " 'unless the defendant has taken some action to narrow the prosecution's burden of proof.' " ( People v. Ewoldt (1994) 7 Cal.4th 380, 400, fn. 4, superseded by statute on other grounds as stated in People v. Britt (2002) 104 Cal.App.4th 500, 505.)

"[T]o be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" ( People v. Ewoldt, supra, 7 Cal.4th at p. 402.) The same standard applies for evaluating the admissibility of other crimes evidence for purposes of negating a claim of an accident or mistake. ( People v. Burnett (2003) 110 Cal.App.4th 868, 881.) "[T]o be admissible to negate a defense of accident or mistake, the uncharged misconduct must be similar to the charged conduct to negate a claim of accident or mistake." ( Ibid.) The trial court has the discretion to admit such evidence after weighing the probative value against the prejudicial effect. ( People v. Ewoldt, supra, 7 Cal.4th at pp. 404-405.)

To establish defendant's guilt in this case, the People had to establish, among other elements, that defendant knew he was being pursued by a peace officer's motor vehicle and intended to evade that peace officer.FN6 That defendant previously attempted to elude a pursuing police officer was highly relevant on the issues of knowledge and intent. The similarity between the two incidents increased the probative value of the evidence. In both cases, a police officer in a marked patrol car, with its lights and siren activated, chased a car driven by defendant through city streets, during which time defendant ran a number of stop signs. Considering these shared characteristics, it reasonably could be inferred that defendant knew he was being pursued by police and intended to evade them.

> FN6. Vehicle Code section 2800.2, subdivision (a) provides in pertinent part: "If a person flees or attempts to elude a pursuing peace officer in violation of Section 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of persons or property, the person driving the vehicle, upon conviction, shall be punished by imprisonment in the state prison, or by confinement in the county jail for not less than six months nor more than one year." Vehicle Code section 2800.1, subdivision (a) provides in pertinent part: "Any person who, while operating a motor vehicle and with the intent to evade, willfully flees or otherwise attempts to elude a pursuing peace officer's motor vehicle, is guilty of a misdemeanor punishable by imprisonment in a county jail for not more than one year if [certain] conditions exist[.]" (Italics added.)

Defendant's suggestion that the trial court abused its discretion in admitting evidence of the prior evading incident because his intent and knowledge were not seriously in dispute at trial is not well taken. Defendant ignores the fact that the court's ruling was made prior to trial. At that time, defendant was expected to assert that he did not know he was being pursued by police. While defendant ultimately did not rely on such a defense at trial, and instead asserted he was acting under duress when he attempted to elude police, at no time did he renew his objection to the admission of evidence concerning the prior incident, ask the trial

8

court to revisit its prior ruling, or take any action to narrow the People's burden of proof. ( People v. Ewoldt, supra, 7 Cal.4th at p. 400, fn. 4.)

To the extent defendant contends evidence of the prior evading itself was unduly prejudicial under Evidence Code section 352, we disagree. As discussed above, such evidence was highly relevant on the issues of knowledge and intent and was not the type of evidence that " ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." ( People v. Kipp (2001) 26 Cal.4th 1100, 1121, citation omitted.)

In sum, defendant has not shown that the trial court exercised its discretion under Evidence Code sections 1101, subdivision (b) or 352 in an arbitrary, capricious, or patently absurd manner in admitting evidence of the prior evading itself.

We need not consider whether the trial court abused its discretion in admitting evidence concerning the drugs and the firearm because any error was harmless.

There was no dispute at trial that defendant was driving the Cadillac and failed to stop when Officer Vu activated the patrol car's red lights and siren. Nor was there any dispute that defendant knew he was being pursued by police or that he attempted to elude them.FN7 Rather, the defense was that defendant failed to stop "because someone in his car had a gun and ... made him feel he had to run."

> FN7. During closing argument, defense counsel expressly disavowed any defense based on the assertion defendant "never saw the police behind him" and told the jury that any assertion "that that's what we're arguing as our defense is ridiculous."

The problem with this defense is that even if the jury believed Hayden threatened defendant with bodily harm if he did not keep driving, Hayden eventually got out of the car and ran off. At that point, any real or perceived threat was gone. Nevertheless, defendant continued his attempt to elude police. Before stopping in the Popeye's parking lot, defendant left the alley, made a number of turns, drove at a high rate of speed, and ran at least four stop signs. While defense counsel urged the jury to find defendant "did not attempt to elude the police ... because he surrendered .... when he got to a place that was safe," there was no evidence to support a finding defendant was not safe the minute Hayden got out of the car and fled. Any suggestion that defendant harbored a generalized fear of law enforcement that justified his ongoing attempt to elude police is wholly unsupported by the record.

On this record, it is not reasonably probable that a result more favorable to defendant would have been reached had the jury not learned defendant possessed a firearm or drugs during the prior evading offense. FN8 ( People v. Malone (1988) 47 Cal.3d 1, 22; People v. Leon (2008) 161 Cal.App.4th 149, 169.)

> FN8. Because evidence of the prior evading itself was properly admitted to show intent, knowledge, and lack of mistake or accident and given the overwhelming evidence of defendant's guilt, any error in admitting evidence of the prior evading itself to prove motive or a common plan or scheme was harmless.

9

1   Respondent's Lodged Document 6, pp. 9-14.

2          A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

3   of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

4   1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

5   unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp,

6   768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

7   Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

8   issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

9          The Supreme Court has reiterated the standards of review for a federal habeas

10  court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the

11  Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

12  granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

13  evidence was incorrectly admitted under state law since, "it is not the province of a federal

14  habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

15  Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

16  state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

17  3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

18  may not grant habeas relief where the sole ground presented involves a perceived error of state

19  law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

20  Protection clauses of the Fourteenth Amendment).

21          The Supreme Court further noted that the standard of review for a federal habeas

22  court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

23  the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

24  order for error in the state trial proceedings to reach the level of a due process violation, the error

25  had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

26  defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

1  112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

2  or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

3  926 F.2d 918, 919 (9th Cir. 1991).

4           Propensity evidence, and at bottom that is what petitioner complains about, i.e.,

5  the prior incident evidence made it more likely that he would be convicted of this offense, has

6  not been found by the Supreme Court to be a violation of due process.  Alberni v. McDaniel, 458

7  F.3d 860, 866 (9th Cir. 2006).  From the AEDPA standpoint, the issue must therefore be resolved

8  against petitioner.

9           Nor does the court find the evidence to be problematic – even including the prior

10  guns and drugs evidence.  Petitioner, in this case, was apparently contriving a mistake or duress

11  story in his defense, and all of the prior act evidence was similar enough to the incident for which

12  he was charged to fairly counteract the mistake or duress defense.  Either petitioner is simply

13  unlucky in the context of to whom he chooses to give rides, or he feels he has to flee the police

14  because he knows his passengers, or himself,  have drugs and guns in their possession.  The latter

15  observation which counters "the bad guys made me do it," or I didn't know what my passengers

16  were up to" defense is much more likely to the point of beyond a reasonable doubt.

17           Accordingly, after conducting an AEDPA review, the court finds that this claim

18  should be denied.

19           B.  Claim 2: Witness Intimidation

20           Petitioner alleges that the trial court failed to investigate his claim that the

21  prosecutor intimidated potential defense witness, Winzer Hayden.  The California Court of

22  Appeal rejected this claim for the following reasons:

23           Defendant next claims the trial court erred by failing to investigate whether the
             prosecutor improperly threatened Winzer Hayden with prosecution if he testified
24           for the defense, and the matter must be remanded for a hearing to determine
             precisely what the prosecutor told Hayden's counsel prior to Hayden invoking his
25           Fifth Amendment right not to testify. We are not persuaded.

26           Defendant sought to call Hayden as a witness at trial, and the trial court appointed

                                            11

Chet Templeton as advisory counsel for Hayden. After speaking with Hayden and familiarizing himself with the case, Templeton advised the court there "appear[ed] to be at least some risk of potential charges against ... Hayden in light of his potential testimony," and he "believe[d] it [was] [Hayden's] present desire to invoke his Fifth Amendment right, if the court would so permit." When the court asked Hayden if he intended to follow Templeton's advice and "invoke [his] Fifth Amendment privilege not to testify," Hayden responded, "I mean it depends if, you know what I mean, 'cause some stuff...." The court explained that if he decided to testify, the court, not counsel, would decide the appropriate scope of the questioning and that Hayden would not be permitted "to pick and choose the questions that [he] answer [ed]...." Hayden said he wanted to testify.

At that point, the prosecutor advised the court that "something came to my attention this morning that is not exculpatory, but I do believe perhaps I need to relate to [Templeton] that he may need to relate to his client if I can speak to him." According to the prosecutor, the information related to an ongoing criminal investigation, could not be disclosed in open court, and concerned the scope of her cross-examination of Hayden. After a brief recess during which the prosecutor spoke to Templeton, and Templeton spoke to Hayden, the court asked Hayden if he was prepared to testify, and he responded, "You know what, I don't want to testify" and invoked his right not to testify.

The court then turned to defense counsel's contention that Hayden's invocation was improper given defense counsel's representation that he would limit his questioning to whether Hayden was in the car on the night in question, possessed a gun, and discarded the gun from the car. Defense counsel argued such questioning "would not at all subject ... Hayden to any Fifth Amendment issue" since the three year statute of limitations applicable to a section 12021 (felon in possession of a firearm) violation had run, and in any case, defendant had already "pled guilty to that gun."

The prosecutor offered to relate what she had told Templeton in camera or to "have law enforcement testify in camera," however, defendant and his counsel would have to be excluded. The court indicated it was inclined to proceed as the prosecutor suggested; however, defense counsel objected to being excluded. He asserted his presence "may be relevant to making certain that [defendant] receive a fair trial" and offered to abide by any court order precluding him from disclosing "anything that [he] would be privy to in camera" to defendant.

Given the concerns voiced by the prosecutor and defense counsel, the court decided it did not need to hear the prosecutor's proffer. The court ruled Hayden's invocation of his right not to testify was proper because by testifying Hayden "would potentially incriminate himself as to possessing or having a gun while fleeing from officers" and "using that gun ... [and] making some implied or direct threats ... towards [defendant]...." The court found that while defense counsel might "desire to parse [Hayden's] testimony to just the gun itself," it would be difficult to do so "in light of the testimony [he had] offered of ... another witness, specifically relating to ... Hayden's conduct in this particular case."

Defense counsel argued that by allowing Hayden to invoke his Fifth Amendment privilege, the trial court had deprived defendant of his due process right and right

12

to a fair trial. He argued Hayden's testimony was critical to the defense, and the court "could have limited [defense counsel's] questioning to whether or not he possessed a firearm at that time and prevented or precluded [defense counsel] from questioning him about a kidnapping."

The prosecutor responded that the statute of limitations had not run for a section 245, subdivision (a)(2) (assault with a firearm) violation, that Hayden "may [also] implicate himself in subsequent activities which would be the subject of cross-examination," and that "the People would be entitled to do a full and complete cross-examination and not to a subscribed version based on the representations and desires of defense counsel...."

Templeton agreed it was unlikely "the [c]ourt would be allowed to limit cross-examination regarding other factors such as what has come out, as I understand it, from other witnesses. And when you mix the two together, it's not just a possession of a gun anymore, it involves alleged serious and violent crimes, which as the [c]ourt knows, the statue of limitations has not run for."

At that point, defense counsel accused the prosecutor of "threatening to prosecute ... Hayden [with assault with a firearm] because of [defendant] trying to raise a valid, relevant defense...." The court disagreed, noting it was "not at all clear that there was any threat ... to prosecute [Hayden] during that brief break to convey additional information." To clarify matters, however, the court asked the prosecutor whether "the communication between counsel was ... a threat to prosecute regarding this case," and the prosecutor responded that the "conversation actually had nothing to do with what happened in 2003. It had to do with other criminal conduct." The prosecutor later specified, "There was no threat. The People want[ed] to make sure that all parties had full information about potential privileges and potential prosecutions that could arise for events other than what occurred in 2003." Thereafter, the court found "there was no threat conveyed by the People, or by [Hayden's] counsel." The court also concluded that Hayden "did not plead to the gun in this case," as defense counsel had repeatedly asserted.

On appeal, defendant charges the trial court "failed to fulfill its duty under ... section 1044 to control the courtroom proceedings and its judicial duty to assure [defendant] due process and a fair trial when it failed to investigate what the prosecutor said to Hayden that caused him to change his mind about testifying for the defense." Defendant asserts the matter must be remanded for a hearing to determine what the prosecutor said to defense counsel. As we shall explain, the trial court adequately investigated whether the prosecutor committed misconduct, and based on that investigation properly concluded she had not.

Pursuant to section 1044, it is "the duty of the judge to control all proceedings during the trial ... with a view to the expeditious and effective ascertainment of the truth regarding the matters involved."

At trial, a defendant has a fundamental right to compel the attendance of witnesses on his behalf. (U.S. Const., 6th and 14th Amendments; Cal. Const., art. I, § 15; In re Williams (1994) 7 Cal.4th 572, 603, citing People v. Mincey (1992) 2 Cal.4th 408, 460, and In re Martin (1987) 44 Cal.3d 1, 29-30.) To establish a violation of

13

this right, the defendant must show: (1) prosecutorial misconduct, i.e., conduct that was " 'entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify' "; (2) interference, i.e., " 'a causal link between the prosecutorial misconduct and the defendant's inability to present the witness' "; and (3) materiality, i.e., " 'at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable.' " ( Williams, supra, 7 Cal.4th at p. 603.)

Here, after defense counsel charged the prosecutor with threatening Hayden with prosecution, the trial court noted it was "not at all clear that there was any threat ... to prosecute," but "to clarify" asked the prosecutor whether she had "threat[ened] to prosecute [Hayden] regarding this case." The prosecutor explained that she advised Hayden's counsel of the potential prosecutions that could arise and that no threat to prosecute had been made. The trial court acted well within its discretion in relying on the prosecutor's representations, particularly where, as here, Hayden was represented by advisory counsel, with whom the prosecutor communicated exclusively, and advisory counsel made no mention of any threat or other misconduct on the part of the prosecutor. On this record, the trial court was not derelict in its duty in failing to ascertain the precise words uttered by the prosecutor to Templeton.

Moreover, substantial evidence supports the trial court's implicit finding that the prosecutor did not commit misconduct. Our Supreme Court has explained: "The forms that such prosecutorial misconduct may take are many and varied. They include, for example, statements to defense witnesses to the effect that they would be prosecuted for any crimes they reveal or commit in the course of their testimony. [Citations.] They also include statements to defense witnesses warning they would suffer untoward consequences in other cases if they were to testify on behalf of the defense. [Citations.] Finally, they include arresting a defense witness before he or other defense witnesses have given their testimony." ( In re Martin, supra, 44 Cal.3d at pp. 30-31.) The prosecutor's conduct here does not fit any of these situations, nor does it otherwise suggest she coerced Hayden.

There is no evidence whatsoever that the prosecutor told Hayden he would be prosecuted or otherwise be penalized if he testified. Rather, her conversation with Templeton concerned " potential prosecutions that could arise for events other than what occurred in 2003." (Italics added.) Such an advisement was proper. (See People v. Harbolt (1988) 206 Cal.App.3d 140, 154-155; People v. Warren (1984) 161 Cal.App.3d 961, 974; cf. People v.. Schroeder (1991) 227 Cal.App.3d 784, 788-789.)

Even if we were to assume arguendo that the prosecutor did engage in misconduct, we would conclude such misconduct was harmless under Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711]. Had Hayden testified as anticipated by defendant-that he was in the car on the night in question, possessed a gun, and discarded the gun from the car-we are convinced the result would have been the same. As defense counsel explained, Hayden's testimony was critical to the defense that "Hayden had a gun and that created duress in the mind of [defendant] and he had to flee." As previously discussed, however, it was undisputed at trial that all three passengers got out of the car in the alley and fled.

1

2   Nevertheless, defendant did not stop. Rather, he continued driving at a high rate of
speed, making a number of turns, and running at least four stop signs. Under these
circumstances, Hayden's failure to testify at trial was harmless beyond a
reasonable doubt.

3

4   Respondent's Lodged Document 6, pp. 14-21.

5        Criminal defendants have a due process right to present witnesses, compel their

6   attendance, and present a defense.  Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038

7   (1973).  "It is well established that 'substantial government interference with a defense witness's

8   free and unhampered choice to testify amounts to a violation of due process.' "  Earp v. Ornoski,

9   431 F.3d 1158, 1170 (9th Cir.2005) (quoting United States v. Vavages, 151 F.3d 1185, 1188 (9th

10  Cir.1998)).  Coercive or threatening behavior towards a potential witness may justify reversal of

11  a defendant's conviction.  See Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351 (1972); Williams v.

12  Woodford, 384 F.3d 567, 601-02 (9th Cir.2004) ("Undue prosecutorial interference in a defense

13  witness's decision to testify arises when the prosecution intimidates or harasses the witness to

14  discourage the witness from testifying.").

15        This court has reviewed the portion of the transcript containing the discussion

16  regarding Hayden's testimony and will repeat some of it here.  Initially, counsel Templeton,

17  appointed to represent Hayden, told the court that there appeared to be some risk of criminal

18  prosecution to Hayden were he to testify.  RT at 307.  Based on that, Templeton advised the court

19  that Hayden wanted to invoke his Fifth Amendment right not to testify.  RT at 307.  However,

20  after being questioned by the court, Hayden said that he would testify.  RT at 312.  Following this

21  determination, the prosecutor told the court that she needed to talk to Hayden's counsel:

22          Prosecutor: Your Honor, something came to my attention this morning that is not
exculpatory, but I do believe perhaps I need to relate to his counsel that he may
23          need to relate to his client if I can speak to him.

24          Court: Not exculpatory?

25          Prosecutor: It's not exculpatory.  It related to the privileged issue specifically and
it relates to the ongoing investigation I cannot relate in open court.
26

15

1    Court: All right. If you wish to convey that privately to counsel–

2    Prosecutor: Thank you.

3    Court: –for the purpose of giving adequate legal advice regarding this incident
     back in '03, you may.

4

5    Prosecutor: Correct.  Well, it actually relates to the scope of the cross-examination
     of this witness.

6    (Off-the-record discussion was held between Ms. Blackburn and Mr. Templeton.)

7  RT at 313-314.

8    Following a brief recess, Hayden invoked his right not to testify.  RT at 315.  The

9  prosecutor then told the court:

10    Your Honor, and with regard to the privilege issue, as I mentioned, there's
      something I could not relate in open court.  I could in camera relate what I told
11    defense counsel.  I also could have law enforcement testify in camera.
      Unfortunately it cannot be on the record and it cannot be in front of this defendant
12    or this defense attorney.

13  RT at 316.

14    The court initially decided to conduct an in camera hearing based on the

15  prosecutor's statement.  RT at 316.  When petitioner's counsel objected to being excluded, the

16  court decided not to have the hearing but to instead hear argument from petitioner's counsel

17  regarding why Hayden's invocation was not lawful.  RT at 318.

18    Petitioner's counsel then argued that Hayden had no basis to invoke the Fifth

19  Amendment because he actually already pled guilty to possession of the firearm he allegedly

20  possessed during the incident involving petitioner.  RT at 322.  Counsel conceded that Hayden's

21  conviction for gun possession was based on a different date, but argued that it was based on the

22  same incident.  RT at 321.  Defense counsel also argued that he was not saying that Hayden

23  kidnapped petitioner (RT at 322) which, of course, would be the other criminal charge Hayden

24  would have been potentially exposing himself to had he admitted to holding a gun to petitioner's

25  head.

26  \\\\\

1    In response, the prosecutor argued,

2    Simply put, defendant has rights.  Witnesses have rights as well.  His attorney has
     advised him as to how he may inculpate himself in an incident form '03 in which
3    the statute of limitations has not run for 245(a)(2) [assault with a firearm].  And
     also he may implicate himself in subsequent activities which would be the subject
4    of cross-examination, which the People would be entitled to do a full and
     complete cross-examination and not to a subscribed version based on the
5    representations and desires of defense counsel.

6    RT at 323.

7    Hayden's lawyer, Templeton, also stated that he would be willing to stipulate that

8    Hayden possessed a gun at the time of the incident.  RT at 324.  However, he was concerned that

9    if Hayden testified further, he would be exposing himself to prosecution for more violent crimes,

10   apparently referring to kidnapping and assault with a firearm.  RT at 323-324.

11   Petitioner's counsel then argued that the prosecutor's "threat" to prosecute

12   Hayden for assault with a firearm 3 ½ years after the incident was outrageous.  RT at 325.  The

13   prosecutor then clarified that her conversation with Templeton earlier had nothing to do with the

14   incident involving petitioner, but concerned other criminal conduct.  RT at 326.

15   After hearing the argument, the trial court found that the prosecutor made no

16   threat to Hayden and that his invocation of his right not to testify was lawful.  RT at 327-329.

17   After reviewing the record, it is clear to this court that the prosecutor's discussion

18   with Templeton concerned Hayden's involvement in criminal matters more recent than the 2003

19   incident involving petitioner.

20   The issue here is problematic, and will always have to be gauged on a spectrum

21   basis.  A testifying witness, at risk for revealing prior criminal conduct, will always feel

22   threatened to one degree or another about the potential for prosecution – that is why the

23   defendant is afforded the privilege not to testify in the first place.  The witness is also afforded

24   counsel who is supposed to advise the witness on the realities of the risk which the witness faces.

25   The prosecution may give, or attempt to give, some further incriminating information to the

26   witness' counsel in order that counsel gives an informed opinion, but such will always have a

17

1  potential to be also viewed as threatening the witness.  Thus, much discretion must be given to

2  the trial judge to ferret out blatant threats simply designed to make the prosecution's job in the

3  ongoing prosecution easier from those situations where necessary information imparted only has

4  the potential to be viewed as a threat by the witness for the defense.

5          The court does not find the analysis utilized in this case by the trial court, and later

6  the appellate court, in placing the potential misconduct on the error free portion of the spectrum

7  as being unreasonable, much less AEDPA unreasonable.  The reasoning speaks for itself and will

8  not be repeated by the undersigned.

9          But even if the undersigned is wrong, and further inquiry via evidentiary hearing

10  is needed to air all the details of the prosecution's mindset in revealing that it had more

11  information with which to incriminate the witness, the upshot of the process, even if

12  prosecutorial misconduct error were to be found, would be to ultimately find that any error on the

13  prosecution's part was harmless.

14          "Under pre-AEDPA law, a habeas petition is entitled to an evidentiary hearing

15  [and discovery] on a claim where the facts are in dispute if 1) he has alleged facts that, if proven

16  would entitle him to relief; and 2) he did not receive a full and fair evidentiary hearing in state

17  court."  See Silva v. Calderon, 279 F.3d 825, 853 (9th Cir. 2002).

18          In Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933 (2007), the Supreme

19  Court recently added another consideration in granting evidentiary hearings.  The Supreme Court

20  held that "[b]ecause the deferential standards prescribed by § 2254 control whether to grant

21  habeas relief, a federal court must take into account those standards in deciding whether an

22  evidentiary hearing is appropriate."  550 U.S. at 464, 127 S.Ct. 1933.  Accordingly, "[i]t follows

23  that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

24  district court is not required to hold an evidentiary hearing."  Id.

25          Petitioner is not entitled to an evidentiary hearing because even were the court to

26  find that the prosecutor improperly threatened Hayden with prosecution, petitioner would not be

1   entitled to habeas relief.  Had Hayden testified that he had a gun in his possession and that he

2   held it to petitioner's head, this would still not explain why petitioner continued to evade the

3   officers after Hayden left his vehicle.  As discussed above, any real or perceived threat was gone

4   at that point.  It is highly unlikely that the jury would have acquitted petitioner had they heard

5   Hayden's proposed testimony.  Because the omission of this testimony did not have "substantial

6   and injurious effect or influence" on the jury's verdict, petitioner is not entitled to an evidentiary

7   hearing as to this claim.  Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993).

8            In making this finding, this court observes that although the Supreme Court and

9   Ninth Circuit have not directly addressed the issue of whether harmless error analysis applies to

10  claims of witness intimidation, other circuit courts have found that it does.  See U.S. v. Foster,

11  128 F.3d 949, 953 (6th Cir. 1997), citing Bank of Nova Scotia v. United States, 487 U.S. 250,

12  255-56, 108 S.Ct. 2369, 2374 (1988) (holding that alleged prosecutorial misconduct during grand

13  jury proceedings, including allegations of witness intimidation, was subject to harmless error

14  analysis); United States v. Weddell, 800 F.2d 1404, 1411-12 (5th Cir. 1986) (holding that

15  relevant inquiry in a case involving witness intimidation is whether the prosecutor's conduct was

16  harmless beyond a reasonable doubt); Peeler v. Wyrick, 734 F.2d 378, 381-82 (8th Cir. 1984)

17  (holding that harmless error rule is applicable to cases involving witness intimidation); U.S. v.

18  Pinto, 850 F.2d 927 (2nd Cir. 1988) (applying harmless error analysis to witness intimidation

19  claim).

20           In U.S. v. MacCloskey, 682 F.2d 468 (4th Cir. 1982), the Fourth Circuit found

21  that harmless analysis should not be applied to witness intimidation claims.  Because

22  MacCloskey was decided before Bank of Nova Scotia, supra, and because the reasoning of the

23  more recent circuit decisions addressing this issue is persuasive, the court finds that harmless

24  error analysis is applicable to witness intimidation claims.

25           In conclusion, because petitioner is not entitled to an evidentiary hearing as to his

26  witness intimidation claim, this claim should be denied.

1    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

2 a writ of habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District

4 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

5 days after being served with these findings and recommendations, any party may file written

6 objections with the court and serve a copy on all parties.  Such a document should be captioned

7 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8 shall be served and filed within ten days after service of the objections.  The parties are advised

9 that failure to file objections within the specified time may waive the right to appeal the District

10 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11 DATED: 06/15/09

12                              /s/ Gregory G. Hollows
                              _____
13 br216.157                    UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26